MITCHELL TEAGUE, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED, PLAINTIFF-APPELLANT v. BAYER AG; BAYER POLYMERS, LLC, N/K/A BAYER MATERIALSCIENCE, LLC; BAYER CORPORATION; CROMPTON CORPORATION; UNIROYAL CHEMICAL COMPANY, INC., N/K/A CROMPTON MANUFACTURING COMPANY, INC.; THE DOW CHEMICAL COMPANY; E.I. DUPONT DE NEMOURS & COMPANY; DUPONT DOW ELASTOMERS, L.L.C.; DSM COPOLYMER, INC.; DSM ELASTOMERS EUROPE, B.V.; EXXON MOBIL CHEMICAL, A DIVISION OR SUBSIDIARY OF EXXON MOBIL CORP., DEFENDANTS-APPELLEES

No. COA07-1108

(Filed 20 January 2009)

**1. Appeal and Error— motion to dismiss with prejudice granted—settlement**

Plaintiff's motion to dismiss his claims with prejudice against defendant Exxon Mobil Chemical, a division or subsidiary of Exxon Mobil Corp., was granted.

**2. Unfair Trade Practices— standing—indirect purchaser—antitrust and consumer fraud—Chapter 75 violations**

The trial court erred in an antitrust and consumer fraud action by dismissing plaintiff's complaint under N.C.G.S. § 1A-1, Rule 12(b)(6) for failure to state a claim for relief based on lack of standing because: (1) the factors in *Associated General Contractors*, 459 U.S. 519 (1983), are not applicable to determine which indirect purchasers have standing to sue under the North Carolina antitrust statutes; (2) a trial court will be better suited to assess whether plaintiff will be able to prove causation based on the alleged antitrust violation at the class certification and summary judgment stages; (3) plaintiff alleged sufficient facts in his complaint to show a right of recovery; (4) the fact that EPDM is a component part and not an end product is not a complete bar to recovery, and fear of complexity for apportioning damages is not a sufficient reason to disallow a suit of an indirect purchaser

given the intent of the General Assembly to establish an effective private cause of action for aggrieved consumers in North Carolina; and (5) allowing indirect purchasers to sue for Chapter 75 violations will best advance the legislative intent that such violations be deterred and that aggrieved consumers have a private cause of action to redress Chapter 75 violations.

**3. Class Actions— full faith and credit to foreign order— additional publication not required**

The decretal portion of the trial court's order requiring additional publication in North Carolina newspapers of the pertinent class settlement is reversed because the trial court failed to give full faith and credit to the order of the Tennessee court finding that the notice of settlement complied fully with the laws of the State of Tennessee, due process, and any other applicable rules of that court.

Appeal by Plaintiff from order entered 11 May 2007 by Judge Ben F. Tennille in Special Superior Court for Complex Business Cases. Heard in the Court of Appeals 26 August 2008.

*Wimer & Jobe, by Michael G. Wimer; and Forman Rossabi Black, P.A., by Amiel J. Rossabi, for Plaintiff-Appellant.*

*Mayer Brown LLP, by Mary K. Mandeville, Gary A. Winters, and Michael S. Passaportis, for Defendant-Appellee DSM Copolymer, Inc.; Pinto Coates Kyre & Brown PLLC, by Richard L. Pinto, for Defendant-Appellee Exxon Mobile Chemical, a division or subsidiary of Exxon Mobil Corp.*

McGEE, Judge.

Plaintiff filed suit under N.C. Gen. Stat. §§ 75-1 and 75-1.1 on 2 April 2004 alleging Defendants engaged in price fixing of ethylene propylene diene monomor elastoiners (EPDM). Plaintiff filed his complaint as a putative class action on behalf of similarly situated North Carolina consumers. Plaintiff filed an amended complaint on 23 December 2004 that removed Defendants DSM N.V., DSM Elastomers Holding Company, Inc., and DSM Elastomers, Inc. from the complaint and added claims that Defendants concealed the alleged conspiracy and illegal conduct from consumers. The case was designated as a complex business case on 15 March 2005 and Special Superior Court Judge Ben F. Tennille was assigned to preside over the case.

Pursuant to N.C. Gen. Stat. § 1A-1, Rule 12(b)(6), Defendants Bayer Corporation, Bayer MaterialScience LLC (f/k/a Bayer Polymers LLC), Crompton Corporation, Crompton Manufacturing Company, Inc., The Dow Chemical Company, E.I. du Pont de Nemours and Company, DuPont Dow Elastomers L.L.C., and DSM Copolymer, Inc. filed a motion on 24 January 2005 to dismiss Plaintiff's first amended complaint for failure to state a claim for relief. Defendants Dow Chemical Company, E.I. DuPont de Nemours & Company, and DuPont Dow Elastomers, L.L.C. (collectively, DDE Defendants) entered into a multistate settlement of the indirect purchaser claims filed against them by consumers in the District of Columbia and twenty-eight states, including North Carolina. Circuit Court Judge John McAfee in Claiborne County, Tennessee approved this settlement on 21 June 2005. Plaintiff filed a motion to dismiss the claims against the DDE Defendants on 26 September 2005.

The trial court heard the remaining Defendants' motion to dismiss Plaintiff's first amended complaint on 21 November 2005 and entered an order allowing Plaintiff to again amend his complaint. Plaintiff filed a second amended complaint on 12 December 2005.

In his second amended complaint, Plaintiff alleged he purchased EPDM roofing materials and a pond liner, as well as at least one vehicle with EPDM components, between 1994 and 2002. Plaintiff's second amended complaint also stated that EPDM was not a consumer product but a component found in many consumer products and that the amount of EPDM in a given product will vary depending on the nature of that product. For example, Plaintiff alleged "[t]he EPDM roofing [material] purchased by Plaintiff and other Class Members is believed to contain at least 90% EPDM" and "[t]he tires, window molding, hoses, and other rubber products purchased by Plaintiff and the other Class Members [are] believed to include 1% or more EPDM."

Plaintiff alleged that between 1994 and 2002, Defendants manufactured, marketed, sold, and/or distributed throughout the United States virtually all EPDM produced in the United States during that time. Plaintiff further alleged in his second amended complaint that Defendants engaged in price fixing of EPDM by agreeing to restrict output and raise prices for the sale of EPDM sold in the United States and elsewhere. Plaintiff claimed that this agreement forced Plaintiff and other consumers to pay higher prices for EPDM while Defendants earned profits exceeding a normal rate of return.

Plaintiff alleged that he and other North Carolina class members absorbed all of the portion of the price affected by the price fixing agreement because middlemen passed on 100% or more of the overcharge from Defendants.

Defendants Bayer Corporation, Bayer MaterialScience LLC, and Bayer AG (collectively Bayer Defendants) agreed to a multistate settlement of indirect purchaser claims on or about 27 October 2005, including the claims of indirect purchasers in North Carolina. Plaintiff filed a motion on 5 April 2006 for leave to dismiss with prejudice the claims against the Bayer Defendants.

Defendants DSM Copolymer, Inc., Chemtura (f/k/a Crompton) Corporation, Uniroyal Chemical Company, Inc., and Exxon Mobile Chemical renewed their motion to dismiss Plaintiff's second amended complaint on 9 January 2006.

In an order entered 11 May 2007, the trial court granted Plaintiff's motion to dismiss claims against the DDE Defendants and the Bayer Defendants, and ordered that notice of the settlement with the DDE Defendants and the Bayer Defendants be published in the Asheville *Citizen-Times* and the Raleigh *News & Observer*. The trial court also granted the moving Defendants' Rule 12(b)(6) motion to dismiss for lack of standing. Plaintiff appeals from the 11 May 2007 order of the trial court.

[1] Following Plaintiff's appeal to our Court, Plaintiff filed a motion with our Court on 18 November 2008 to dismiss his claims with prejudice against Defendant Exxon Mobil Chemical after settlement with this Defendant. We grant Plaintiff's motion to dismiss the claims with prejudice against Defendant Exxon Mobil Chemical, a division or subsidiary of Exxon Mobil Corp.

On appeal, Plaintiff argues that the trial court erred by dismissing Plaintiff's claims pursuant to N.C. Gen. Stat. § 1A-1, Rule 12(b)(6) when Plaintiff had standing to sue under N.C. Gen. Stat. §§ 75-1 and 75-1.1, and also erred in requiring publication of additional class notice.

I.

[2] In his first assignment of error, Plaintiff argues the trial court erred in dismissing his complaint pursuant to N.C.G.S. § 1A-1, Rule 12(b)(6) for failure to state a claim for relief because Plaintiff lacked standing.

The "purpose of a motion [to dismiss] pursuant to N.C.G.S. § 1A-1, Rule 12(b)(6) is 'to test the legal sufficiency of the pleading against which [the motion] is directed.' " *Eastway Wrecker Serv., Inc. v. City of Charlotte*, 165 N.C. App. 639, 647, 599 S.E.2d 410, 415 (2004) (internal citations omitted). "Rule 12(b)(6) ' "generally precludes dismissal except in those instances where the face of the complaint discloses some insurmountable bar to recovery." ' " *Meadows v. Iredell Cty.*, 187 N.C. App. 785, 787, 653 S.E.2d 925, 927 (2007) (internal citations omitted). "One such bar to recovery is a lack of standing, which may be challenged by a motion to dismiss for failure to state a claim upon which relief may be granted." *Id.* at 787, 653 S.E.2d at 927 (citing *Krauss v. Wayne County DSS*, 347 N.C. 371, 373, 493 S.E.2d 428, 430 (1997) ("The 12(b)(6) motion was made on the basis that [the] plaintiff did not have standing[.]")).

As our Supreme Court recently stated, "[a]s a general matter, the North Carolina Constitution confers standing on those who suffer harm: 'All courts shall be open; [and] every person for an injury done him in his lands, goods, person, or reputation shall have remedy by due course of law . . . ' " *Mangum v. Raleigh Bd. of Adjust.*, 196 N.C. ——, ——, —— S.E.2d ——,—— (2008) (quoting N.C. Const. art. I, § 18).

"Although North Carolina courts are not bound by the 'case or controversy' requirement of the United States Constitution with respect to the jurisdiction of federal courts, similar 'standing' requirements apply 'to refer generally to a party's right to have a court decide the merits of a dispute.' " *Meadows*, 187 N.C. App. at 787, 653 S.E.2d at 927-28 (quoting *Neuse River Found., Inc. v. Smithfield Foods, Inc.*, 155 N.C. App. 110, 114, 574 S.E.2d 48, 52 (2002), *disc. review denied*, 356 N.C. 675, 577 S.E.2d 628 (2003)).

> In *Neuse River*, this Court defined "[t]he 'irreducible constitutional minimum' of standing" as: (1) "injury in fact"—an invasion of a legally protected interest that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Meadows*, 187 N.C. App. at 787, 653 S.E.2d at 928 (quoting *Neuse River*, 155 N.C. App. at 114, 574 S.E.2d at 52). "Parties without standing to bring a claim, cannot invoke the subject matter jurisdiction of the North Carolina courts to hear their claims." *Id.* at 787, 653 S.E.2d at 928.

In the case before us, the trial court quoted *Slaughter v. Swicegood*, 162 N.C. App. 457, 464, 591 S.E.2d 577, 582 (2004) in its order, stating that "[a] motion to dismiss a party's claim for lack of standing is tantamount to a motion to dismiss for failure to state a claim upon which relief can be granted according to Rule 12(b)(6)." The Courts in our state use the term "standing" to "refer generally to a party's right to have a court decide the merits of a dispute." *Neuse River*, 155 N.C. App. at 114, 574 S.E.2d at 52. A court may not properly exercise subject matter jurisdiction over the parties to an action unless the standing requirements are satisfied. *Aubin v. Susi*, 149 N.C. App. 320, 324, 560 S.E.2d 875, 878 (2002). The trial court in the present case correctly noted that standing is often an issue in an indirect purchaser case, such as the case before us, where there are contentions that injury is conjectural and damage awards are speculative. An indirect purchaser is one who purchases a product from some intermediary party rather than directly from the manufacturer. *See Hyde v. Abbott Laboratories*, 123 N.C. App. 572, 574, 473 S.E.2d 680, 681-82 (1996).

The United States Supreme Court addressed the issue of standing for indirect purchasers under federal antitrust law in *Hanover Shoe Co. v. United Shoe Mach. Corp.*, 392 U.S. 481, 20 L. Ed. 2d 1231 (1968), and in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 52 L. Ed. 2d 707 (1977). In *Hanover Shoe*, the plaintiff shoe manufacturer sued the defendant, a manufacturer of shoe machinery, for treble damages alleging the defendant created a monopoly over its more complicated and important shoe machinery by leasing, but refusing to sell, the machinery. *Hanover Shoe*, 392 U.S. at 483, 20 L. Ed. 2d at 1236. The defendant argued that the plaintiff shoe manufacturer suffered no injury because it simply passed the illegal overcharges on to its customers. *Id.* at 487-88, 20 L. Ed. 2d at 1238. The Supreme Court rejected the so-called "passing-on" defense and held that a direct purchaser was entitled to damages even if it did pass on the higher prices to its customers. *Id.* at 488-89, 20 L. Ed. 2d at 1238-39.

In *Illinois Brick*, the State of Illinois brought suit as an indirect purchaser against manufacturers and distributors of concrete block. *Illinois Brick*, 431 U.S. at 726-27, 52 L. Ed. 2d at 713. At issue was whether an indirect purchaser plaintiff could use the "passing on" theory offensively to show injury inflicted by the defendant's violations of federal antitrust laws. *Id.* The Supreme Court held that indirect purchasers did not have standing to sue under the federal antitrust laws. *Id.*

Although indirect purchaser suits were barred in federal antitrust cases by *Illinois Brick*, the U.S. Supreme Court later held that states could permit indirect purchaser suits under state antitrust laws in *Associated Gen. Contractors v. Carpenters*, 459 U.S. 519, 74 L. Ed. 2d 723 (1983) (*AGC*). *See also California v. ARC America Corp.*, 490 U.S. 93, 104 L. Ed. 2d 86 (1989) (A state may allow an indirect purchaser to sue under the state's own antitrust law.). In *AGC*, the plaintiff labor union sued the contractor's association under § 4 of the Clayton Act alleging the contractor's association had conspired with nonunion contractors and subcontractors to adversely affect the trade of the unionized firms and the unions themselves. *Id.*; 15 U.S.C. § 15 (2004). In holding that the union was not a proper plaintiff under § 4 of the Clayton Act, the Supreme Court identified several factors to be considered in determining standing under federal antitrust law. *Id.* These factors include: (1) whether the plaintiff is a consumer or a competitor in the market in which trade was restrained; (2) whether the injury alleged is a direct or indirect impact of the restraint alleged; (3) whether there exists an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (4) whether the damages claim is highly speculative; and (5) whether the plaintiff's claims risk duplicative recoveries and would require a complex apportionment of damages. *AGC*, 459 U.S. at 539-44, 74 L. Ed. 2d at 738-42.

The issue of whether suit by an indirect purchaser is allowed in North Carolina was decided by our Court in *Hyde v. Abbott Laboratories* when we held that indirect purchasers have standing under N.C. Gen. Stat. § 75-16 to sue under the antitrust laws of North Carolina. *Hyde*, 123 N.C. App. at 584, 473 S.E.2d at 688. In *Hyde*, the plaintiffs were consumers of infant formula manufactured by the defendants. *Id.* at 573-74, 473 S.E.2d at 681-82. In the plaintiffs' class action suit, they alleged that the defendants violated several of North Carolina's antitrust laws by " 'engaging in a continuing conspiracy to fix the wholesale price of infant formula sold within the United States, including North Carolina.' " *Id.* at 573, 473 S.E.2d at 681. The plaintiffs also alleged that this "illegal conspiracy caused an increase in wholesale prices paid by the parties who purchased the infant formula directly from the manufacturer ([]direct purchasers) above that which the direct purchasers would have paid absent any conspiracy." *Id.* Our Court stated that the plaintiffs in *Hyde* were "indirect purchasers from the defendant manufacturers because they purchased infant formula through parties other than the [defendant] manufacturer." *Id.* at 574, 473 S.E.2d at 681-82. In *Hyde*, the trial

court granted the defendants' motion to dismiss for lack of standing, but on appeal our Court reversed, holding indirect purchasers have standing to sue under the antitrust laws of North Carolina. *Id.* at 584, 473 S.E.2d at 688.

·In the present case, Plaintiff argues that *Hyde* established standing for all indirect purchasers, and that the trial court ignored this Court's holding in *Hyde* by imposing limits on the rights of indirect purchasers to sue under the North Carolina antitrust statutes. In contrast, Defendants contend that while *Hyde* established that indirect purchasers have standing, *Hyde* did not delineate the scope or limits of that standing and the well-established doctrine of proximate cause requires that there be limits to this standing. They argue that to adopt Plaintiff's interpretation of *Hyde* would mean that every indirect purchaser claiming to be injured under the antitrust statutes would have a cause of action no matter how attenuated the causal connection between the antitrust violation and the alleged injury. Defendants contend this outcome would be inconsistent with the principles of proximate cause and could result in an unmanageable surge in antitrust litigation.

Defendants point out that in a prior order entered by Judge Tennille in *Crouch v. Crompton Corp.*, 2004 NCBC 7 ¶ 47, 2004 WL 2414027 (N.C. Super. Ct. Oct. 26, 2004), Judge Tennille had stated that *Hyde* did not set forth the scope and breadth of standing under the North Carolina antitrust statutes. In *Crouch*, the trial court stated there was a need for certain boundaries for indirect purchaser standing and it applied a slightly modified five factor *AGC* test. *Crouch*, 2004 NCBC 7 ¶¶ 66-74. In the case before us, the trial court applied these same five factors to determine whether Plaintiff had standing.

Plaintiff argues that the *AGC* factors are not applicable to the issue of standing for indirect purchasers in antitrust cases and that *AGC* is distinguishable from the present case. Plaintiff correctly distinguishes *AGC* from the case before us in several relevant ways, including that the plaintiff in *AGC* was not an indirect purchaser. The U.S. Supreme Court held in *AGC* that the plaintiff union was not a person injured by reason of an antitrust violation. *AGC* involved competitors rather than consumers. Also, the plaintiffs in *AGC* alleged breach of a collective-bargaining agreement and not antitrust violations. *See AGC*, 459 U.S. 519, 74 L. Ed. 2d 723.

Defendants contend the modified *AGC* five factor test applied by the trial court in this case is a logical and appropriate standard by

which to distinguish actual injuries resulting from violations of North Carolina antitrust statutes from those complaints that are too remote and attenuated. Defendants argue that trial courts in several other states have considered this issue and have applied the *AGC* factors in determining which indirect purchasers have standing to sue under their state antitrust laws. Defendants cite the following cases where trial courts in other states applied the *AGC* factors to dismiss indirect purchaser claims brought by retail customers against Visa and MasterCard. The retail customers alleged that the credit card companies' tying arrangements with retail stores caused prices to increase. *See Fucile v. Visa U.S.A., Inc.*, No. S1560-03 CNC, 2004 WL 3030037 (Vt. Super. Ct. Dec. 27, 2004); *Southard v. Visa U.S.A., Inc.*, No. LACV 031729, 2004 WL 3030028 (Iowa Dist. Ct. Nov. 17, 2004), *aff'd*, 734 N.W.2d 192 (Iowa 2007); *Knowles v. Visa U.S.A., Inc.*, No. CV-03-707, 2004 WL 2475284 (Me. Super. Ct. Oct. 20, 2004); *Tackitt v. Visa U.S.A., Inc.*, No. CI03-740, 2004 WL 2475281 (Neb. Dist. Ct. Oct. 19, 2004). However, in these actions, damages alleged by the plaintiffs were through an alleged inflated cost of goods sold by merchants who were injured by Visa's and MasterCard's inflated cost of financial services. The plaintiffs were not consumers or competitors in the allegedly restrained market, nor were the plaintiffs indirect purchasers in that the plaintiffs did not end up with a product supplied by the defendants. Antitrust laws were intended to protect competition and, thus, standing is generally limited to consumers or competitors. There was no connection between the plaintiffs' purchases of consumer goods and the defendants' alleged unlawful tying of debit services in the Visa and MasterCard suits. Therefore, the courts denied indirect purchaser standing to the plaintiffs in several of these actions. *See Anderson Contracting, Inc. v. Bayer AG*, CL 95959, 18 (Iowa Dist. Ct. 31 May 2005) ("Neither *Associated General Contractors* nor *Southard* involved a product, and thus price-fixing was not at issue, as it is in the present case.").

Plaintiff cites a recent Iowa District Court decision in which the court rejected the *AGC* factors in determining an indirect purchaser's standing, because *AGC* did not involve price fixing and because the plaintiffs in *AGC* were competitors rather than purchasers. *Id.* As stated above, *AGC* is distinguishable from the present case and we hold the *AGC* factors do not apply in determining which indirect purchasers have standing to sue under the North Carolina antitrust statutes.

TEAGUE v. BAYER AG

[195 N.C. App. 18 (2009)]

Plaintiff has alleged in his complaint that he is a consumer who purchased EPDM roofing material and a pond liner manufactured, marketed, distributed, or sold by one or more of Defendants, as well as at least one vehicle with EPDM components. Plaintiff's allegations of standing show he is a consumer and a purchaser of EPDM. According to the complaint, Plaintiff alleges EPDM comprises 80 to 85 percent of ethylene-propylene elastomers. Plaintiff therefore has alleged that EPDM is a significant component of at least one of the products that he purchased. Plaintiff contends there exists a causal connection between the Defendants' alleged price fixing and the Plaintiff's injury. Plaintiff has alleged in his complaint, that because EPDM is a significant component part of the products at issue in this case, an increase in the price of EPDM could have a ripple effect, thereby increasing the price of the product for Plaintiff, the ultimate consumer.

Defendants contend there are multiple inputs at multiple steps in the EPDM distribution chain, and the allegedly price-fixed product is transformed into a new product in at least one such step. These multiple variables, Defendants argue, render injury and damages impossibly speculative, and therefore the causal chain cannot be established. Defendants cite *Crouch v. Crompton Corp.*, 2004 NCBC 7 ¶ 30, 2004 WL 2414027, *18-25 (N.C. Super. Ct. Oct. 26, 2004), a case in which the trial court expressed strong concerns about stretching antitrust law to cover damages in cases like these. In *Crouch*, the trial court analyzed the complexity and costliness of adjudicating an antitrust case based on rubber compounds and chemicals that form a component of tire products at issue. The trial court in *Crouch* was concerned in part about the lack of express statutory language granting indirect purchaser standing or any definitive ruling by our Supreme Court on indirect purchaser standing. However, our Court and the courts in our state are clearly bound by the prior opinion of our Court in *Hyde* dealing with indirect purchaser cases, unless and until it is overturned by our Supreme Court or by enactments of the General Assembly, which has not occurred in the more than twelve years since *Hyde* was decided by our Court. *See In the Matter of Appeal from Civil Penalty*, 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989).

The issue now before our Court is a Rule 12(b)(6) motion analysis. A motion to dismiss under Rule 12(b)(6) requires us to determine "whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be

granted[.]" *Harris v. NCNB*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987) (citation omitted). The complaint is to be liberally construed in ruling upon a Rule 12(b)(6) motion, and it should not be dismissed unless it appears to a certainty that the plaintiff is entitled to no relief under any set of facts which could be proved in support of the claim. *Jenkins v. Wheeler*, 69 N.C. App. 140, 142, 316 S.E.2d 354, 356, *disc. review denied*, 311 N.C. 758, 321 S.E.2d 136 (1984). In a Rule 12(b)(6) determination we must decide whether Plaintiff, as an indirect purchaser of products containing EPDM, has antitrust standing to recover damages under Chapter 75. What is at issue is Plaintiff's right of access to the courts, not the merits of his allegations. A trial court will be better suited to assess whether Plaintiff will be able to prove causation based on the alleged antitrust violation at the class certification and summary judgment stages. *See Investors Corp. v. Bayer AG*, S1011-04 CaC. (Vt. Super. Ct. 1 June 2005). At a Rule 12(b)(6) stage in this action, Plaintiff has alleged sufficient facts in his complaint to show a right of recovery. *See Davis v. Messer*, 119 N.C. App. 44, 51, 457 S.E.2d 902, 906 (1995).

The injury that Plaintiff alleges appears to be within the type of injury that the General Assembly intended to address through our state's antitrust and consumer fraud law. If Plaintiff can demonstrate that the increased EPDM prices affected the price of the goods he purchased, then he will have established the type of injury to indirect purchasers that the General Assembly intended to remedy by allowing indirect purchaser suits.

Defendants challenge the speculative nature of Plaintiff's damages claim. *See AGC*, 459 U.S. at 542, 74 L. Ed. 2d at 741. Plaintiff argues he "will prove his damages through expert testimony using accepted economic analysis[.]" Defendants contend this simple statement of what Plaintiff states he will do at trial is not convincing enough to refute the specific and well-supported concerns of the trial court as to the speculative nature of Plaintiff's damages.

We agree with the trial court's statement that calculation of Plaintiff's damages would be a "daunting task." In *Hanover Shoe*, the Supreme Court observed how tracing a cost increase through several levels of a chain of distribution "would often require additional long and complicated proceedings involving massive evidence and complicated theories." *Hanover Shoe*, 392 U.S. at 493, 20 L. Ed. 2d at 1241. It is correct that the fact that EPDM is a component part and not an end product is not a complete bar to recovery; however, this consid-

eration does make calculating Plaintiff's damages more difficult. *See Illinois Brick*, 431 U.S. at 759, 52 L. Ed. 2d at 733.

Defendants contend that courts would have to isolate the effect of the alleged conspiracy on the price of EPDM and rule out the numerous other factors that could cause a price increase in these products such as inflation, prices of other inputs, transport costs, product demand, and market conditions. Thus, a rigorous economic analysis would be required to determine whether increased prices were the result of the alleged price fixing or the result of some other factor.

The U.S. Court of Appeals for the Ninth Circuit has recognized, "Complex antitrust cases . . . invariably involve complicated questions of causation and damages." *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1478 (9th Cir. 1997). Even if the present case proves to be no exception, that is not sufficient reason to dismiss for lack of standing. As the trial court found, considering several products containing EPDM adds to the complexity of apportioning damages in this case. The analysis described above would have to be conducted for every product at issue in order to accurately calculate Plaintiff's damages. Our Court recognized in *Hyde* that a suit by indirect purchasers under our antitrust laws would be complex. However, "fear of complexity is not a sufficient reason to disallow a suit by an indirect purchaser, given the intent of the General Assembly to 'establish an effective private cause of action for aggrieved consumers in this State.' " *Hyde*, 123 N.C. App. at 584, 473 S.E.2d at 687-88 (quoting *Marshall*, 302 N.C. at 543, 276 S.E.2d at 400).

As our Court concluded in *Hyde*, "allowing indirect purchasers to sue for Chapter 75 violations will best advance the legislative intent that such violations be deterred, and that aggrieved consumers have a private cause of action to redress Chapter 75 violations." *Id.* at 584, 473 S.E.2d at 688. We therefore hold that Plaintiff has standing to bring this antitrust and consumer fraud action. We reverse the order of the trial court dismissing Plaintiff's claims.

II.

[3] In his second assignment of error, Plaintiff argues the trial court erred in requiring publication of additional class notice of the settlement with the DDE Defendants and the Bayer Defendants in the Asheville *Citizen-Times* and the *The News & Observer* of Raleigh. Plaintiff specifically contends the trial court failed to give

full faith and credit to the order of Judge John McAfee of the Circuit Court of Tennessee, finding the notice of settlement given to the Bayer settlement class members "complied fully with the laws of the State of Tennessee, due process, and any other applicable rules of the Court."

Plaintiff cites *Freeman v. Pacific Life Ins. Co.*, 156 N.C. App. 583, 577 S.E.2d 184 (2003), in support of his argument. In *Freeman*, the plaintiffs argued that notice given to them pursuant to a final settlement order of a class action lawsuit pending in Kentucky was inadequate and that the notice did not meet due process standards. *Freeman*, 156 N.C. App. at 585, 577 S.E.2d at 186. The plaintiffs argued that the Kentucky settlement was not entitled to full faith and credit in North Carolina. This Court's review was limited to whether the Kentucky court had already litigated the due process and jurisdictional issues. We determined that the Kentucky judgment was entitled to full faith and credit. *Id.* at 586-90, 577 S.E.2d at 186-89. Therefore, the notice given pursuant to the Kentucky order was adequate and binding on the North Carolina Courts. *Id.*

Judge McAfee in the case before us determined that "[n]otice given to the Bayer Settlement Class members was reasonably calculated under the circumstances to inform the Bayer Settlement Class" and that such notice "complied fully with the laws of the State of Tennessee [and] due process[.]" The record in this case thus shows that the Tennessee court addressed the notice and due process issues in its order. The United States Constitution directs that "[f]ull faith and credit shall be given in each state to the public acts, records, and judicial proceedings of every other state." U.S. Const. art. IV, § 1. The United States Supreme Court has also held that "a judgment entered in a class action, like any other judgment entered in a state judicial proceeding, is presumptively entitled to full faith and credit under the express terms of [28 U.S.C. § 1738]." *Matsushita Elec. Indus. v. Epstein*, 516 U.S. 367, 374, 134 L. Ed. 2d 6, 17 (1996). 28 U.S.C. § 1738 (2007) provides that "[t]he records and judicial proceedings of any court of any . . . State . . . shall have the same full faith and credit in every court within the United States . . . from which they are taken."

We hold the trial court erred in failing to give full faith and credit to the order of the Tennessee court. The decretal section of the trial court's order requiring additional publication in North Carolina newspapers of the class settlement is reversed. Reversed and remanded.

Judges McCULLOUGH and STROUD concur.

Judge McCullough concurred in this opinion prior to 31 December 2008.